And we'll move on to our fourth and final argument for today in Weber v. O'Malley, case number 23-2672. You didn't go far. Chad Haffield Thank you, your honors, again, this is Chad Haffield. For this claim, I'd like to go back to the opening argument before the judge, the initial discussion in the record, where we hit the issues head on, and the judge asked about – well, I brought up the fact that we wanted to argue that there is new material evidence here, that Dr. Grothaus, prior to the alleged – I mean, prior to the date last insured, had found sacralization of the spine upon objective exam. That means that it's not moving. ALJ asked if there was objective evidence, laboratory signs, labs, or x-rays. At that point, it was said to go to 4F, page 97, there's a rheumatologist, Sally Deepa, who found – who specifically notes x-rays show partial fusion of the L5 vertebra. That is the sign – so right there, ALJ's reliance on Dr. Jahnke, a prior and medical expert not in her field of expertise, who said there's no evidence of sacralization. We have Dr. Grothaus, the primary care provider, November, December, finding forward flexion, sacralization of the spine, referral takes some time. Counsel, I think Judge Berzon has a question. I – some definition or explanation of some of these terms would be helpful. Ankylosing spondylitis, what is that? Ankylosing spondylitis is – Is that what you're talking about now, or are you talking about something else? No, we're talking about ankylosing spondylitis, for sure. But there, there was an earlier finding that you didn't have that, right? Based on blood tests and so on. Well, the blood test is probably a misnomer. The rheumatologist, especially in the fields, didn't have the same thoughts about the HLA-B27. The rheumatologist in 4 of 18 had no problem with that. This is a medical expert in a prior place. The medical expert there said that there's no evidence of sacralization. Was there a finding now that she now has it, although she didn't have it before? Yes. And that's what we're saying. So, Dr. Grodhaus in November, December 2017 found sacralization. Sacralization is the bony fusion of the spine, which is the classic sign of ankylosing spondylitis. In April of 18, when it got to the rheumatologist, the rheumatologist said, hey, x-rays show partial fusion of the L5 spine. She diagnosed ankylosing spondylitis versus psoriatic arthritis with, I think, inflammatory arthropathy, which is a disorder for inflammatory arthritis. ALJ asked, was there any x-rays prior to the DLI? At which there isn't of that, but there's a clinical finding by the doctor examining of sacralization of the spine. That's objective findings. It just takes a matter of months to get to the rheumatologist. That's a matter of practicality, not materiality. Can I ask a question? What evidence do we have as to whether or not this ankylosing spondylitis existed during the prior period? I mean, I think this is not something that develops, you know, in 24 hours or in a very short period. It's a condition that gradually gets worse. So, what evidence do we have that he had this or didn't have this in the earlier period? Well, I think the primary thing is he's having progressive worsening pain. Went to Dr. Grothaus in November of 2017 and found a forward base gait and sacralization of the L5. So, that's at the point where it's old collection. That Weber did not undergo any new testing during that period to substantiate ankylosing spondylitis. Is that not true? The objective, the referral to the rheumatologist happened April 2nd, 2018. So, just a little over three months after the date last insured. But the objective clinical findings showing it progressed, he had a forward flex gait and sacralization of the spine was prior to the date last insured. He didn't have it before. It's the earlier finding. I mean, this has to do with the race judicata-like problem. If he didn't have the ALJ with regard to the earlier period, found that he didn't have it. Is that right? Right. There was no sacralization found or noted on exam in the earlier period. That's what the medical experts said. Medical experts said there's no sacralization. There's no evidence of bony fusion. Didn't have that April 2nd, 2018, rheumatologist saying the x-rays did show partial fusion. Didn't have Dr. Grothaus' treatment note, November 17, stating that had sacralization of the L5 vertebra. She said that's the classic sign of ankylosing spondylitis and I don't have any evidence of it. So we have evidence of it now during this period. Not only that, we also have evidence of Dr. Grothaus' Diagnosed with ongoing ankylosing, I'm sorry, spondylitis. But the earlier finding was he didn't have it, right? Right. So ongoing doesn't sound, sounds like he had it before. Was he preparing to make a new finding? Well, yes, he was a new provider. He wasn't a provider at that point. It progressed. I mean, he was already on medication, emerald, inflammatory arthropathy, possible ankylosing spondylitis. These are new findings. This was the classic sign of ankylosing spondylitis. In fact, if we look what I argued in my opening 14.09 and equaling, the finding they use for meeting the listing is what degree of forward flexion does an individual have? 30 degrees, you do it. I said, there's no one actually measured the degree of forward flexion, so we can't have a meeting. But we certainly have the findings at that point. There's no requirement for a certain laboratory finding on doing that. So those things which are most important considered by the social security were present. It seems to be the ALJ is arguing about whether, oh, well, maybe this is a different kind of inflammatory arthritis. Inflammatory arthritis is the broader term. Ankylosing spondylitis, the synovitis in the hands, whether it's a different kind of inflammatory arthritis, wouldn't have a real impact. I mean, to say you want a very specific diagnosis, I mean, just to throw the baby out with the bathwater, especially since the judge for the back impairments just gave the very general term of degenerative disc disease. And so part of why he limited Dr. Grothaus, his findings, which proved to be disabling in this case, per vocational expert testimony, was that, hey, there is no ankylosing spondylitis diagnosis that he found supported, and that there's no nerve compression, which, again, just shows another misunderstanding of the record. MRI showed no nerve root compression, which is a herniated disc, where the bone pokes into a certain point. They found spinal canal stenosis, which is a narrowing of the spine, for which the Dr. Wall, the orthopedic surgeon, did a decompression surgery, which by definition is to relieve compression of the nerves, not because of just a herniated disc nerve root. And so the judge will say there's no evidence of nerve root compression, but that's a different finding. Neurogenic claudication was from narrowing the spine. And so the ALJ is throwing out this opinion and the supporting opinion of the physical therapist, who did a very thorough functional capacity evaluation by saying, hey, these findings aren't here, which they were, and then saying this back pain was resolved immediately upon the surgery. We find that's not true. We find that in July, 2018, over a 12-month period from the ledge onset date, he's still using a cane, still having swelling of the legs, still having pain, and said that the surgery has not been helping his pain. I thought there was an intervening car accident. The judge doesn't mention that, and that is not really a big part of the... The judge doesn't mention it? The judge doesn't mention that, and that's not a big part of the claim or anything that was done there. I thought the explanation was that he was okay, that the surgery did, was successful, but then he had a car accident. Well, it's hard to say. I mean, everyone does better in the recovery, rest-recovery period. He wasn't going out. He was laying down, taking narcotics. When he got out, he did have a car accident, did this, but we'd say that's not a new... The judge isn't arguing that there's a new impairment. Ankylosing spondylitis wouldn't go away. Unflammable arthritis wouldn't go away. His hand impairments with active synovitis, which shows active inflammation, wouldn't be impacted at all by a back surgery, and yet we have Mark Johnson, functional capacity evaluation in 2017, is done again in 2019, and consistently shows, both of them, that his fine manipulation is in the first percentile, meaning that there are 100 workers, 99 workers would be able to do fine manipulation faster and better than he would, and yet there is no finding whatsoever in the judge's RFC any limitation for manipulative limitations. Whether the ILJ finds that that's not a specific vocational, how much could he do, couldn't do, when you're in the bottom one percentile, and the Dr. Broadhouse had found that had significant limitations in fine manipulation, and is showing active synovitis multiple times in the finger joints, it's inappropriate to find manipulative limitations. In our briefing, we showed how the SSR showed that as limitation of sedentary work with occasional manipulation is going to be disabling limitation. The judge doesn't even address it. What the judge does is mostly squabble with which is the appropriate diagnosis, and since he could not find it or couldn't find the findings for nerve compression, was there if we're going to disregard everything that was based upon. Dr. Broadhouse did do a physical examination. Timothy Sablo did do a physical examination. Mark Johnson did do physical examinations that showed and was our basis for the limitations that are inconsistent with the judge's RFC. Now, the judge's RFC, he even found that Mark Johnson, the functional capacity evaluations limited Mr. Weber to lifting 10, lifting 10 pounds or 12.5 pounds, but only carrying 10 pounds, and said, that's not a big enough reason to make me change anything. That's not material. Material means within this context, and then it would change the findings at one of the steps of the sequential evaluation. The ALJ had already found that he could only stand four hours, standing or walking. If you also look at the lifting sedentary, you have, I mean, the definition, the difference between light and sedentary work is either you're standing or you're lifting. If both are at the sedentary level, then this is a sedentary job. The judge at step five does not find any sedentary jobs. These are only light jobs. Further, the last record the judge notes of the use of a cane was that he was using it. Testimony that he continues to use it. He has to alternate sitting and standing. You'd have the portion of the time he's standing, he'd be one-handed. The RFC does not account for any of these things, and these were present prior to the date last insured and shown to continue throughout the record. That's a material change that affects the outcome, even on the judge's own, that those things to which he did not reject in the record. Counsel, do you want to reserve time? You're under three minutes. Thank you. Good morning, honors. May it please the court, my name is Michael Mullen, and I represent the acting commissioner of Social Security on this matter. Substantial evidence supports the LJ's finding that Weber was not disabled. The primary thrust of Weber's argumentation here was that they did not, the back surgery did not significantly improve their condition, but that's actually belied by the record. Well, I thought the primary thrust was that there was more, there was medical evidence that demonstrated that he had these conditions that the prior ILJ found that he didn't have. Like ankylosing spondylitis? That and also nerve compression, and the ALJ here said there was no new and material evidence showing nerve root compression, and Dr. Grote's opinion is unpersuasive, because he based his conclusion on unsupported diagnoses, and he says that there was new evidence, but there was no evidence of those things. First, as a threshold matter, this is Weber's counsel's theory. This is Weber's counsel's theory and interpretation of the medical evidence. The ALJ was within right to rely on the qualified medical expert testimony of Dr. Jahnke, who did look at the results and actually found that they didn't. But, I mean, it would be helpful to me, at least, to evaluate what's being said about whether there was new evidence now, and as I understand it, he says, part of it is with regard to the spondylitis, if that's how you say it, that there had been nothing in the x-rays that showed whatever the main evidence of such a condition is, but now there is. That's what I'm trying to say. Is that true? Are there new x-rays? Did they show something different? They don't show anything materially different, meaning nothing that would warrant a departure on the residual functional capacity. And, more importantly, Dr. Jahnke testified that there were really two primary factors showing that a palate didn't have ankylosing spondylitis. The first was that they didn't have the antigen testing that would be positive 99% of the time. So this is the most reliable testing there is. Is that testing now? There was no sign of that. In fact, at the 2020 hearing, years after the evidence that Mr. Hatfield is alluding to, at the hearing, the ALJ said, can you point to me objective medical evidence in the record that would show ankylosing spondylitis as a medically determinable impairment? And counsel pointed to none. And that's at pages 81 to 83 of the record in the 2020 administrative hearing transcript. Again, he has shown no positive antigen testing that would corroborate the ankylosing spondylitis. And again, his view that the fusion shows ankylosing spondylitis is merely his unqualified medical interpretation of the evidence. There is no objective antigen testing that would show the ankylosing spondylitis. And I think beyond that, the RFC isn't so much informed by diagnosis as it is by function. And the ALJ still evaluated the Weber's level of function as opined by the medical providers and sources, and also as alleged by Weber himself. And ALJ found inconsistencies of both. For example, Dr. Grafis, he found that Weber was unable to work due to ankylosing spondylitis. And ALJ, of course, found that that was inconsistent with Dr. Jahnke's persuasive and qualified medical expert testimony that there was no objective evidence showing ankylosing spondylitis. But also there were... Wait a minute, you just switched gears. I thought you were going to tell us why the RFC wasn't consistent with the opinion stated. Why the opinion stated with regard to Dr. Grafis and other people during the relevant period were not... Why the ALJ was correct in finding them. Right, so I was just beginning with that and I was going there. So to add to that, Dr. Grafis opined that Weber had limited gait, that he was slow, that he limped, that he had a limited range of motion. And what we see was we don't find that to be a continuous level of impairment throughout the record at all. In fact, if you go to records in June of 2017, we see normal range of motion. We see only mild swelling that required, quote, no further vascular intervention. That's at page 505 of the record. A month later, in July 2017, at page 503, we have no reported leg pain. We have normal extremities. We have Dr. Banerjee in a comprehensive physical examination concluding that Weber was a, quote, healthy male who had normal strength, normal sensation. And the ALJ acknowledged that there was some worsening of neurogenic claudication toward the end of the relevant period. From about September to December, there was worsening. We saw that, for example, at the physical therapy examination with Mr. Johnson. But after the end of the relevant period, so the relevant period, the insured status here ends December 31st, 2017. A few months later, in March 2018, Weber had laminectomy surgery, back surgery that he reported, quote, significantly improved his symptoms. That's directly contrary to his testimony and statements that he made later, which was that surgery made me worse. Surgery didn't help. And that's belied by the actual treatment records that he has, where he said at page 408 of the record, I had no symptoms before the accident. That's the intervening moment that your honors were alluding to earlier. In May 2018, he had a 70 mile per hour car accident hitting a deer. And after that, he alleged, quote, mild worsening of symptoms. He indicated that his pain was a three out of 10, that it was managed with prescribed pain medication that could bring his pain levels to a- Did he tie that pain to the car accident? He did. Yes. I thought I heard opposing counsel say that, I thought he said the district court, but I'm wondering if he meant the ALJ didn't mention the car accident. The ALJ really focuses on the non-continuous nature of the impairment. The ALJ summarizes the medical evidence, but like, for example, I don't think that the ALJ says the phrase deer accident or car accident in the course of the incident decision. Nevertheless, the ALJ does consider those medical records, talks about them, acknowledges them, but it focuses the analysis on- And in a way that is basically saying there's no symptoms initially, and then after May of 2018, there are some symptoms. That's exactly right. And it's tied to the ALJ's analysis that Weber was not disabled because he failed to meet the durational impairment. And again, there's no continuous 12 month period where a medically determinable impairment rendered Weber unable to work. Again, this is a short period. We have an alleged onset date in May 2017 and the end of the relevant period in December of the same year. But in June and July of 2017, we have medical records showing that Weber is significantly more able than alleged. We do have a worsening of impairments from about September to December, suggesting a worsening of neurogenic claudication. And then after the relevant period, but still less than a year later, we have a laminectomy surgery where he reported again, in his own words, significant improvement. And then again, page 408, he endorses having no symptoms before the 70 mile an hour car accident with a deer. Even then he's only alleging mildly worse symptoms. Again, pain levels of three out of 10, two or three out of 10 with prescribed medication. He remained ambulatory. And so again, substantial evidence supports the ALJ's analysis. And I accept that this medical record is susceptible to different interpretations. But the relevant inquiry here is whether substantial evidence supports the ALJ's actual findings. The substantial evidence does show that there was a worsening of impairments or worsening of symptoms late in the relevant period, but that there was significantly more function than alleged in the months prior to September, 2017. And in the months following the relevant period, a successful surgery that improved his symptoms, that brought his pain levels down to a manageable level. And that that was exacerbated significantly by a car accident with a deer. More than almost half a year, almost half a year after the end of the relevant period. And yes, Pellant does allege worsening of symptoms through 2018. But I would also posit that many of his allegations about worsening symptoms aren't even really borne out by the record, or at least they suggest he's not as limited as alleged. For example, in May, 2018, we have medical, objective medical records showing, you know, just mild limitations to the range of motion, negative straight leg raise testing, a full five out of five motor strength, intact sensation. We have that again, two months later in July, 18, page 398 of the record. Later in the record, I believe in October of 2018, we have objective medical evidence showing normal muscle tone, normal full strength throughout, no distress, normal gait and heel toe walking. That's at page 1032 of the record. And so even if we were to entertain that the improvements weren't backed by substantial evidence, again, the record still shows that he had a higher level of function than alleged. Substantial evidence does support the ALJ's analysis. Unless this panel has any questions about, for example, the step two or step three listings, subjective symptom evaluation, I'll close and say that substantial evidence does support the ALJ's findings and decision finding Weber not disabled. Even if this court disagrees, remand would be the appropriate remedy. Weber argues otherwise, but he hasn't shown the necessary criteria to justify such an extraordinary remedy. Therefore, the commissioner requests this panel affirm. Thank you. Thank you. Thank you for your argument and we'll hear rebuttal. Thank you, Your Honor. So just to go back, the x-ray evidence is not my lay opinion. The x-ray evidence, the lay opinion was of the judge. As I pointed to the judge in the opening argument, the 4F page 79, SCAR 422. This is the rheumatologist, Gali Deepa, who said x-ray evidence shows partial fusion of the sacroiliac joints. I'm not relying on my own interpretation of medical records. That's the pre-rheumatologist. Excuse me. That was after the relevant period. That's in April of 2000, April 2nd, 2018. So just three months and a couple of days after the date last insured. But it was brought about by the objective clinical finding of sacralization of the L5 vertebrae by Dr. Grothaus. Well, Grothaus, his medical notes say enclosing spondylitis onset several years ago.  Right. Right. The medical expert says HLA-B27 is 99% of the cases. She's not as special in this field. But it doesn't matter. This is your problem. Whether it's right or not, it was credited by the earlier ALJ and is therefore binding now. No? Right. But there's different findings. That ME did not find the classic symptom of enclosing spondylitis, which is sacralization. That's what it talks about in the social career listing 14.96 is sacralization and the amount of forward flexion. That's what they consider. That is the criteria social care looks at for enclosing spondylitis and inflammatory arthritis. Secondly, this was objectively found prior. He was on Enbrel, a biologic by a rheumatologist. Don't put people on biologics unless there's evidence of it. As far as the car accident, the judge never mentions the car accident, never state that as a basis. He only says he improved significantly right after the back surgery. But Dr. Salvo, in July and October of 18, said pain and swelling due to inflammatory arthropathy, which wouldn't be caused by a car accident. Yeah, I read the inference that it was from the car accident because of the timing of it. And I think that's what your counsel just said, was that three out of 10 was after the car accident. And ALJ didn't specifically mention the car accident, but that's what the timing references. This is routine for every case with a major back surgery. They're going to say better pain until they start to go back. I mean, you usually have, you're off work three months, even people who aren't Social Security claimants, because you're lying on your back with pain medication, narcotic pain medication. The pain is going to be lower. But a car accident would not cause inflammatory arthritis, for which Timothy Salvo, in July and October 18, said there's swelling of the legs caused by inflammatory arthropathy, which is another word for arthritis. The testing by the two different physical therapists, this isn't just watching him walk. Like we talked to Dr. Banjari, cited here, this was someone who hadn't seen him for six months and was treating for coughing up blood. This was someone who measured his walking over the course of one day, then a second day. Did it at 17 before the end of development and 19 showing significant difficulties, significant gait pattern deviations, partial abnormalities, range of motion limitations with majority of spinal movement, range of motion strength limitations with the majority of the bilateral upper and lower extremity movements. Again, first percentile Purdue pegboard, that's fine manipulation testing. That's one of the best findings we have in Social Security cases for a person's ability to manipulate, because they're actually doing it over and over as opposed to a CE where you just pick a coin off the table once. OK. Counsel, you're over time. We've given you additional time. We appreciate it. You thank you. Appreciate both counsel for your arguments in the case. The case is now submitted and that includes our arguments for the week. Thank you.
judges: FLETCHER, BERZON, NELSON